**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**
**ALBUQUERQUE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 1:22-MJ-00096 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| GABRIEL MONICO GUEVARA, | ) | Wednesday, February 9, 2022 |
| | ) | |
| Defendant. | ) | (10:34 a.m. to 11:49 a.m.) |

**PRELIMINARY EXAMINATION / DETENTION HEARING**

**BEFORE THE HONORABLE STEVEN C. YARBROUGH,**
**UNITED STATES MAGISTRATE JUDGE**

**APPEARANCES:**

| | |
|---|---|
| For Plaintiff: | NORA WILSON, ESQ.<br>U.S. Attorney's Office<br>District of New Mexico<br>P.O. Box 607<br>Albuquerque, NM 87103 |
| For Defendant: | ERLINDA O. JOHNSON, ESQ.<br>620 Roma Ave. N.W.<br>Albuquerque, NM 87102 |
| U.S. Pretrial/Probation: | A. Galaz |
| Court Reporter: | Recorded; Liberty: Hondo |
| Clerk: | K. Dapson |
| Transcribed By: | Exceptional Reporting Services, Inc.<br>P.O. Box 8365<br>Corpus Christi, TX 78468<br>361 949-2988 |

**Proceedings recorded by electronic sound recording;**
**transcript produced by transcription service.**

EXCEPTIONAL REPORTING SERVICES, INC

2

INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LEISHA LOPEZ | 4 | 11 | 23 | 38 |

**ARGUMENT**

| BY MS. WILSON | 24/29/45 |
|---|---|
| BY MS. JOHNSON | 26/41 |

**PROFFER**        35

**FINDINGS/RULINGS OF COURT**    31/46

1      **Albuquerque, NM; Wednesday, February 9, 2022; 10:34 a.m.**

2                          **(Call to Order)**

3              **THE CLERK:**  *United States of America versus Gabriel*

4      *Guevara.*

5              **THE COURT:**  Counsel can enter your appearances.

6              **MS. WILSON:**  Good morning, Your Honor, Nora Wilson on

7      behalf of the United States.  And to the extent required, I was

8      here for the Court's admonition regarding *Brady* and its

9      progeny.  I understand the United States' obligations and will

10     comply.

11             **THE COURT:**  Thank you.  For the defense.

12             **MS. JOHNSON:**  Good morning, Your Honor, Erlinda

13     Johnson on behalf of Gabriel Guevara, who appears before the

14     Court from the Cibola County Correctional Center.  And we have

15     executed a waiver of personal presence this morning.

16             **THE COURT:**  All right.  Thank you.  And good morning

17     to you, Mr. Guevara.  This is Judge Yarbrough.  Can you hear

18     and understand me okay?

19             **THE DEFENDANT:**  Yes.

20             **THE COURT:**  All right.  So as we've discussed, we're

21     here for your preliminary hearing, and then if necessary your

22     detention hearing.  Your attorney has indicated correctly that

23     you've signed a document indicating that you're willing to do

24     both of those hearings by video rather than in person today.  I

25     just want to be sure, is that all right with you?

1          **THE DEFENDANT:**  Yes, it is.

2          **THE COURT:**  All right.  So, Ms. Wilson, do you have

3   your first witness ready to call for the preliminary hearing?

4          **MS. WILSON:**  Yes, Your Honor.  The Government calls

5   FBI Special Agent Leisha Lopez.

6          **THE COURT:**  Okay.  Ms. Lopez, I see you -- if you

7   could go ahead and come on the screen there.  Okay.  All right.

8   Ms. Lopez.

9          **MS. LOPEZ:**  Can you hear me well?

10         **THE COURT:**  I can hear you, Ms. Lopez, yes, thank

11  you.  So, Agent Lopez, will you go ahead and raise your right

12  hand and I'll swear you in?

13            **LEISHA LOPEZ, GOVERNMENT'S WITNESS, SWORN**

14         **THE COURT:**  Okay.  Thank you, you can put your hand

15  down now.  And you can start whenever you're ready, Ms. Wilson.

16         **MS. WILSON:**  Thank you, Your Honor.

17                    **DIRECT EXAMINATION**

18  **BY MS. WILSON:**

19  Q    And, Ms. Lopez, can you tell us where you work?

20  A    I am a special agent with the FBI for about five years.

21  Q    And can you -- did you have any law enforcement experience

22  before that?

23  A    No, I do not.  I now currently work for the Violent Crime

24  and Gang Task Force (indisc.) FBI here in Albuquerque.

25  Q    Okay.  I would like to ask you a little bit about your

Lopez - Direct / By Ms. Wilson                                5

1  familiarity with an investigation regarding Gabriel Guevara.

2  Can you tell me what happened on January 18th of 2022 involving

3  Gabriel Guevara?

4  A    Yes.  So detectives with the Albuquerque Police

5  Department, with the APD, executed two search warrants, one at

6  Gabriel Guevara's residence, an apartment, and Gabriel

7  Guevara's smoke shop.  And there at both locations they located

8  an amount of firearms.  I think there was approximately ten

9  firearms in total, and also about 50 pounds of marijuana

10  combined between both locations.

11  Q    And are you aware as far as the initial State search

12  warrants that were prepared what the general investigation was

13  up until the point they executed the warrants?

14  A    Yes.  My knowledge is that they were investigating

15  Mr. Guevara also for distributing fentanyl pills.  Yes, so

16  essentially was also (indisc.) distribution.

17  Q    Okay.  I'd like to break it down just a little bit as far

18  as what was located inside of Mr. Guevara's residence.  You

19  mentioned several firearms and marijuana.  Can you explain what

20  was located inside the residence specifically?

21  A    Yes.  So I'm here just have my (indisc.) so they located a

22  Glock pistol, a Beretta pistol, an A-15 (indisc.) --

23          THE COURT:  Just a second.  Let me interrupt you,

24  Agent Lopez.  I just -- because it's more difficult on the

25  video to know when you're actually reading from something and

Lopez - Direct / By Ms. Wilson                              6

1  when you're actually testifying from your memory.  So what

2  you've got to do is testify from your memory.

3              **THE WITNESS:**  Okay.

4              **THE COURT:**  If you can't remember something, then

5  Ms. Wilson can ask you some questions about whether you're

6  remembering something or not.  But we just need to know when it

7  is that you're actually testifying from something that you have

8  learned or that you remember as opposed to something that

9  you're reading.  So let me go ahead and let you follow-up on

10  that first, Ms. Wilson.

11              **MS. WILSON:**  Yes, Your Honor, thank you.

12  **BY MS. WILSON:**

13  Q    And just to -- I don't need the exact firearms but just

14  the number of firearms and then also the -- any other evidence

15  that was located in the residence.

16  A    There were seven firearms in the residence, a total of

17  approximately $58,000 in cash, and about 35 pounds of marijuana

18  inside the apartment.

19  Q    Were there any other controlled substances located there?

20  A    Yeah.  They found I think it was oxycodone pills and a

21  fentanyl pill as well.

22  Q    And were there also articles inside of the apartment that

23  would indicate that is indeed Mr. Guevara's apartment?

24  A    Yes.  There were pictures of Mr. Guevara and also mail

25  directed to Mr. Guevara as well there in the apartment.

Lopez - Direct / By Ms. Wilson                    7

1  Q    Okay.  And with regard to the -- oh, and sorry, how many

2  bedrooms were the apartment -- was the apartment?

3  A    It's just a one-bedroom apartment.

4  Q    And with regard to the smoke shop, can you explain what

5  was located there?

6  A    Yes.  So in the smoke shop (indisc.) back room, and in

7  that back room they located two rifles and one pistol and about

8  20 pounds of marijuana.  Yeah.

9  Q    And how did they gain access to that smoke shop?

10 A    Mr. Guevara gave them the keys or told them where the keys

11 were to the smoke shop.  They first went to the apartment and

12 then they got the keys and went to the smoke shop afterwards.

13 Q    And with following up in this investigation, did you look

14 in -- look further at the firearms that were seized?

15 A    Yes, I did.  One of the firearms from the smoke shop, it

16 was a rifle and it had what -- red stains consistent with blood

17 on it, and as well as the -- I don't know how to put it, like a

18 drum extended magazine also had blood on it there in the smoke

19 shop.  And they were still --

20 Q    (Indisc.)

21 A    -- I think five of them had been reported stolen as well.

22 Q    And did some of them include high capacity magazines as

23 well?

24 A    Yes.

25 Q    And with regard to the amounts of marijuana that you had

Lopez - Direct / By Ms. Wilson                    8

1   just referenced, approximately 35 pounds and 20 pounds, in your

2   training and experience is that consistent with personal use or

3   trafficking?

4   A    (Indisc.)

5          **MS. JOHNSON:**  Objection, lack of foundation, Your

6   Honor.

7          **THE COURT:**  I'll sustain it.  You can provide a

8   little bit more about what her background and experience is.

9          **MS. WILSON:**  Sure.  Yeah, let me back it up a little

10  bit.

11  **BY MS. WILSON:**

12  Q    Agent Lopez, can you tell me about your training with

13  regard to trafficking investigations?

14  A    Yes.  So I assist with drug trafficking investigations.  I

15  work with other agents that are considered experts in court as

16  well.  So part of our daily (indisc.) includes drug trafficking

17  investigations.

18  Q    And before you became an agent were you also -- did you

19  also take trainings involving drug trafficking investigations?

20  A    Yes.  We covered some of that at the academy as well.

21  Q    And had you -- and here in Albuquerque, do you have

22  experience with participating in drug trafficking

23  investigations?

24  A    Yes, I do.

25  Q    Okay.  So in this case, with regard to the 35 pounds and

Lopez - Direct / By Ms. Wilson                                    9

1    the 20 pounds of marijuana that were seized, in your training

2    and experience is that more consistent with small use or drug

3    trafficking?

4              **MS. JOHNSON:**  Your Honor, I'm going to object again.

5    I believe that it's -- there's still a lack of foundation, just

6    general training and experience I would submit to the Court

7    doesn't cover it.

8              **THE COURT:**  I'll allow her to answer.  I think at

9    this point it goes to the -- well, first of all, the rules of

10   evidence don't apply.  But to the extent that they would, it

11   would go to the weight, not the admissibility.  It could

12   certainly be something that you could cross examine her on so

13   I'll go ahead and allow that answer.  So you can go ahead and

14   continue, Ms. Wilson.  I'm allowing the -- oh, did -- I'm not

15   sure if she ever actually provided an answer to the question.

16             So, Ms. Lopez, I think the question to you is whether

17   the amount found, the amount of marijuana found, was consistent

18   with drug trafficking.

19             **THE WITNESS:**  Yes, it's consistent with drug

20   trafficking.

21             **THE COURT:**  All right.  Go ahead, Ms. Wilson.

22             **MS. WILSON:**  Thank Your Honor.

23   **BY MS. WILSON:**

24   Q    And just as a matter -- were both the residence and the

25   smoke shop here in Bernalillo County, District of New Mexico?

Lopez - Direct / By Ms. Wilson                          10

1   A    Yes.

2          **MS. WILSON:**  Okay.  Your Honor, that is the questions

3   that I would like to go over with regard to the preliminary

4   hearing.  I do also have questions for Agent Lopez with regard

5   to the detention hearing.  Would you like me to proceed to that

6   or break it into the two pieces?

7          **THE COURT:**  Might be more efficient if we did it

8   together.  But, Ms. Johnson, if you want to do it separate, I

9   actually don't have strong feelings so tell me your thoughts.

10         **MS. JOHNSON:**  Your Honor, I would prefer to do them

11  separately.  I think that it's important to perhaps do the

12  preliminary hearing first and then argue whether there's

13  probable cause.  And then if the Court finds probable cause,

14  proceed to the detention hearing.

15         **THE COURT:**  I think that's fine.  I mean, technically

16  there's no -- I mean not technically.  There's no detention

17  hearing if there's no probable cause, and so I think it's fine

18  to go ahead and go through the probable cause.  And then if

19  there's a need for the detention hearing you can ask some more

20  questions about that.  So let's go ahead and, Ms. Johnson, you

21  can conduct your cross examination with regard to probable

22  cause then.

23         **MS. JOHNSON:**  Thank you, Your Honor.

24  //

25  //

**CROSS EXAMINATION**

**BY MS. JOHNSON:**

Q    Agent Lopez, you testified you've been an agent for five years.

A    Yeah, approximately five years, yeah.

Q    Okay.  And how many drug trafficking investigations have you yourself been involved in?

A    I'd have to go back and look but there have been several.

Q    What does that mean; "several" meaning five, ten?

A    I'd have to go -- yeah, I'd have to go back and look honestly (indisc.) ten, 20.  I mean, we do search warrants, we do arrest warrants having to do with drugs, we do control buys having to deal with drugs.

Q    How many have you worked on as a case agent yourself?  Not as an assisting agent but as the case agent?

A    I would have to go back and look if you want an exact number (indisc.) you know, I don't have an exact number (indisc.) you want.

Q    Not a ballpark figure, anything like that.

A    It may not be accurate.  I could tell you ten, 15.

Q    Okay.  How many of those involved marijuana?

A    Specifically I think two.  One was heavily just involving marijuana.

Q    And these were where you were the case agent yourself.

A    Yes, I was.

Lopez - Cross / By Ms. Johnson                                    12

1   Q    And you were not involved in this investigation, correct?

2   A    In the actual investigation of this case, no.

3   Q    It was the Albuquerque Police Department, right?

4   A    Yes.

5   Q    And what the Albuquerque Police Department had was one

6   controlled buy approximately three days before January 10th of

7   2022, correct?

8   A    That's what the search -- State search warrant said, one

9   for the -- they included one for the house and one for the

10  smoke shop.

11  Q    Right.  So we'll talk about the house first.  So according

12  to the APD investigation, they did one control buy within three

13  days of January 10th, 2022, correct?

14  A    Yes.  And they did surveillance and had other information

15  of trafficking, according to the search warrants.

16  Q    Well, I'm looking at the search warrant.  Can you tell me

17  where it indicates that they had other information of drug

18  trafficking?

19  A    I don't have it in front of me but I believe he says he

20  has other information of other trafficking or buys or something

21  along those lines.

22  Q    Have you read the search warrant for the home?

23  A    Yes, I've read it.  I just don't have it in front of me

24  right now.  If you --

25  Q    Okay.

Lopez - Cross / By Ms. Johnson                          13

1   A      -- would like, I can pull it up.

2   Q      Well, and the search warrant indicates within the past 72

3   hours I made contact with a confidential informant, it advised

4   -- I advised it to purchase an amount of fentanyl pills from a

5   residence located at 6315 Cochiti Road Southeast, right?  You

6   remember reading that.

7   A      Yes.

8   Q      Okay.  In which through surveillance and other ongoing

9   narcotics transactions I had knowledge of narcotics

10  transactions taking place at this residence; is that what

11  you're referring to?

12  A      Yeah.  That's what I'm referring to.

13  Q      Okay.  But the officer, the detective, doesn't specify

14  what other information he had, correct?

15  A      Not in the search warrant, no.

16  Q      Okay.  And so the buy that was done within 72 hours of

17  January 10th was made from the home from a male subject,

18  correct?

19  A      Male subject meaning Guevara?

20  Q      That's what the search warrant states, doesn't it?  It

21  states a male subject, right?

22  A      Yes, if you have it in front of -- I don't have it in

23  front of me but, yes, if you're telling me, I believe you.

24  Q      Do you have any reason to dispute the search warrant

25  simply says the CI made a buy from a male subject?

Lopez - Cross / By Ms. Johnson                    14

1   A    No, I don't have no reason to dispute it.

2   Q    And in fact the warrant didn't specify that the person

3   that the buy was made from was Mr. Guevara, correct?

4   A    I don't think so.  I would have to look at that but I

5   don't think so.  I don't recall reading that.

6   Q    And then this search warrant was signed on January 10th,

7   right?

8   A    Yes.

9   Q    And then it was executed on January 18th, correct?

10  A    (indisc.) yes.

11  Q    And when APD detectives executed the search warrant, there

12  were actually two men in Mr. Guevara's apartment, correct?

13  A    Yes.  There was one in the living room and Guevara was in

14  the back in the bedroom.

15  Q    Okay.  And so you don't know if this other male who was

16  also in the apartment lived in that apartment, correct?

17  A    My understanding was that he was just crashing there, like

18  staying temporarily.  But I don't know all the details of that.

19  Q    So the answer to my question, let me ask it again.  You

20  don't know if that second male actually lived in that

21  apartment, do you?

22  A    I don't know if he lived there permanently, no.

23  Q    And the items that were found in the apartment, the

24  marijuana, they were just clippings, weren't they?

25  A    There were the bags and the marijuana was inside of kind

1    of sealed bags.

2    Q    Okay.  But it was marijuana clippings, wasn't the actual

3    marijuana itself, wasn't it?

4    A    It was like the little balls.

5    Q    Okay.  And you don't know if Mr. Guevara uses marijuana,

6    do you?

7    A    I am aware that he has a license to possess and not to

8    sell.

9    Q    So he has a license to use marijuana, correct?

10   A    Yes.

11   Q    So as far as you know he is a marijuana user, right?

12   A    He has a license to possess but not up to 35 pounds of

13   marijuana that was found.

14   Q    But my question, Agent Lopez, is you know he uses

15   marijuana, correct?

16   A    I don't know if he uses.  I know that he has a license to

17   possess it.

18   Q    And you actually don't know if the marijuana found -- well

19   let me ask you this.  The marijuana that was found was found in

20   the closet in the bedroom, right?

21   A    It was found in the bedroom in bags throughout the

22   bedroom.  I'd have to go back and look at all the pictures.

23   Q    And you don't know if that marijuana was marijuana

24   Mr. Guevara had for his personal use.

25   A    The amount that was there, it's not consistent with

1   personal use.

2   Q    You don't know if Mr. Guevara had that marijuana or that

3   marijuana was being used for personal use, do you?

4   A    I'll repeat my answer.  The amount of marijuana that was

5   there was not for personal use (indisc.) --

6   Q    And I'll repeat my question.  I'm sorry, and I'll repeat

7   my question.  You do not know if that marijuana was for

8   personal use, correct?

9         **MS. WILSON:**  Objection, asked and answered.

10        **MS. JOHNSON:**  Your Honor, it's been nonresponsive.

11  It's a simple yes or no.

12        **THE COURT:**  I'll let the answer stand.  I mean,

13  she -- you asked if it's for personal use.  She said the amount

14  is inconsistent with personal use.  So if you want to elaborate

15  on that, Special Agent Lopez, that's fine.  Otherwise I think

16  it's been answered.  But let me let you if you want to

17  elaborate on it, that's fine.  If you don't have anything else

18  to say, I'll let the answer stand.

19        **MS. JOHNSON:**  I'll move on, Your Honor.

20        **THE COURT:**  Okay.  Go ahead.  I'll overrule the

21  objection.  Or I'll sustain the Government's objection.  Go

22  ahead.

23  **BY MS. JOHNSON:**

24  Q    Agent Lopez, you are not familiar with Mr. Guevara's

25  pattern of drug use, are you?

1   A    I am not.

2   Q    And the firearms that were found in the apartment, none

3   was found in the closet, correct?

4   A    I'd have to go back and look at the pictures.  They were

5   kind of scattered in the drawers and just --

6   Q    Well --

7   A    -- everything was scattered.

8   Q    -- you've looked at the inventory for the search warrant,

9   right?

10  A    Yes.

11  Q    And according to the inventory, most of the firearms were

12  in drawers in the -- in a -- in the bedroom, right?

13  A    Uh-huh.

14  Q    Is that yes?

15  A    Yes.

16  Q    Okay.  And the marijuana was found in a closet, according

17  to the inventory, correct?

18  A    Yes.

19  Q    And so according to the inventory, none of the firearms

20  was found in the closet where the marijuana was found, correct?

21  A    Yeah.  According to the inventory (indisc.) they put it in

22  the drawers I think what they put in there.

23  Q    Okay.  So one firearm was in the living room behind a

24  sofa, and then another one was on the living room table, right?

25  So two were out in the living room, correct?

1  A    Yes.

2  Q    But there was also the other person, the other male, who

3  was found in the living room as well, correct?

4  A    In the living room.

5  Q    And the other firearms were put away in drawers in the

6  bedroom, correct?

7  A    Yes.

8  Q    You had also -- let's talk about the smoke shop.  You are

9  aware that there were -- there are at least five individuals

10  who work at that smoke shop; were you aware of that?

11  A    I am not aware of that.

12  Q    And you testified that about approximately 20 pounds of

13  marijuana were found in the back room.

14  A    Yes.

15  Q    Do you know if the alleged marijuana in the bedroom in the

16  home and in the smoke shop were tested?

17  A    Yes.  They were field tested for the (indisc.).

18  Q    And in the smoke shop, you testified there were two rifles

19  and one pistol; is that correct?

20  A    Yes.

21  Q    Okay.  And but they were not with the marijuana, were

22  they?

23  A    They were all in that small room in the back.  They were

24  accessible to the marijuana.  If you were there, you can access

25  it, one by the door, and the marijuana was all over.

1    Q    What do you mean by "all over?"

2    A    In jars, in -- sort of in different locations of the room.

3    So were the firearms.

4    Q    Now, the --

5    A    It's a small room.  They are in a small room also in his

6    house.

7    Q    Okay.  The -- you testified earlier that there had been a

8    controlled buy made from the smoke shop, right?

9    A    Yes.

10   Q    Okay.  And that controlled buy also was done approximately

11   three days or within three days of January 13th; is that

12   correct?

13   A    Yes, 72 hours I think that's what indicates.

14   Q    And the controlled buy, according to the informant, was

15   made from a male subject, right?

16   A    According to the warrant, yes.

17   Q    And it doesn't indicate that the buy was made from

18   Mr. Guevara, right?

19   A    I don't think so.

20   Q    And you testified also that you believe that there was

21   some stains, like blood stains, on a firearm.

22   A    Yes.

23   Q    Do you have a chemistry background?

24   A    No.  I said they're consistent with blood.

25   Q    Did you have it tested?

1   A    No.  I have to take it to the lab to have it tested.

2   Q    But it has not been tested.

3   A    It has not been tested, no.

4   Q    So at this point you cannot confirm or testify

5   definitively under oath that it was blood.

6   A    Gabriel Guevara told me it was blood.

7   Q    Okay.  And what he told you was that a friend of his cut

8   his finger when he was handling that firearm, didn't he tell

9   you that?

10  A    He told me that he was shot when he was in a shooting with

11  someone else and that he decided to take the firearm from him.

12            **THE DEFENDANT:**  No, but he had his finger

13  (indisc.) --

14            **MS. JOHNSON:**  Gabriel, --

15            **THE COURT:**  One second, Mr. Guevara.

16            **MS. JOHNSON:**  Gabriel, --

17            **THE COURT:**  You know, I know your attorney doesn't --

18  you -- I'm going to give you a chance to talk to her before she

19  finishes privately.  I don't want you to accidentally say

20  something that could come back and hurt you, okay?

21            **THE DEFENDANT:**  I apologize.

22            **THE COURT:**  No, that's fine.

23            **MS. JOHNSON:**  Thank you.

24            **THE COURT:**  It's okay.  But we're on video so you

25  can't just pass her notes.  I know that makes it harder.  So

1    I'll give you a chance to talk to her --

2                THE DEFENDANT:  Okay.

3                THE COURT:  -- before she concludes her cross, okay?

4    Go ahead, Ms. Johnson.

5                MS. JOHNSON:  Thank you, Your Honor.

6    BY MS. JOHNSON:

7    Q    Agent Lopez, however this blood that you claim my client

8    told you about was a friend of his; is that correct?

9    A    He told me was some guy that he knew, friend of his, yeah.

10   Q    Okay.  But you have no evidence that Mr. Guevara was

11   involved in any type of violent crime, do you?

12   A    No.  That's why I needed this DNA warrant to get his swabs

13   and have it sent to the lab to have it compared.

14   Q    Okay.

15               MS. JOHNSON:  May I have a moment, Your Honor?

16               THE COURT:  Sure.  Why don't I let you not only look

17   at your notes but also have a moment to talk to your client?

18   So let's take like a three-minute recess.  If you need more

19   time, just tell me when we come back.  But I want to give him a

20   chance to tell you anything he wants, okay?

21               MS. JOHNSON:  Thank Your Honor.  Cibola, I'm going to

22   call the on-deck phone.

23               MS. SPEAKER:  Okay.

24               MS. JOHNSON:  Thank you.

25               THE COURT:  Okay.  We'll be in a short recess.

1    Thanks.  We'll do five minutes.

2         **(Recess taken from 10:59 a.m. to 11:04 a.m.)**

3              **MS. JOHNSON:**  Yes, Your Honor.  Just a couple more

4    questions for Agent Lopez.

5    **BY MS. JOHNSON:**

6    Q    Agent Lopez, isn't it true --

7              **MS. JOHNSON:**  Oh, I'm sorry.  May I proceed?

8              **THE COURT:**  No, no, I -- it's hard on Zoom.  We talk

9    over each other.  I was just saying go ahead.

10             **MS. JOHNSON:**  Okay.  Thank you.  Sorry, Judge.  Agent

11   Lopez, are you ready?

12             **THE WITNESS:**  Yes.

13             **MS. JOHNSON:**  Okay.

14   **BY MS. JOHNSON:**

15   Q    Agent Lopez, isn't it true that what Mr. Guevara told you

16   was that his friend had a wound on his finger from having been

17   shot previously, correct?

18   A    No.  He told me that he went there after the shooting,

19   bleeding before going to the hospital, and that he was trying

20   to get rid of that firearm so Mr. Guevara offered to hold it

21   for him.

22   Q    And did he tell you -- when did he tell you that?

23   A    After I arrested him.

24   Q    And isn't it true Mr. Guevara had requested to speak with

25   an attorney after you arrested him?

Lopez - Redirect / By Ms. Wilson                              23

1   A    No.  He asked me if he had an attorney and I didn't -- he

2   didn't have an attorney at the time.  I didn't know it was an

3   attorney.  And he waived his rights, he signed my little form

4   so because he -- the State case had been dismissed at that

5   time.

6   Q    Okay.  You are aware, though, he did ask for an attorney

7   when he was arrested by APD, right?

8   A    When he was arrested by APD, yes.

9   Q    Now, are you -- you are aware that on January 18th, 2022,

10  APD detectives, after they executed the warrant in the morning,

11  went back to the apartment and retrieved some additional

12  evidence.

13  A    I am not aware of that, no.

14       **MS. JOHNSON:**  I have no further questions at this

15  point, Your Honor.  Thank you.

16       **THE COURT:**  Okay.  Redirect.

17       **MS. WILSON:**  Just within the context of the

18  preliminary hearing specifically.

19                     **REDIRECT EXAMINATION**

20  **BY MS. WILSON:**

21  Q    Did Mr. Guevara ever indicate to you how he obtained the

22  firearms that you've referenced?

23  A    I mean, he talked about purchasing firearms in general

24  and, yeah, like he would just get it from people.  The one

25  specific one with the -- the one that we're referencing the

1    blood, he said he got from this person so --

2         **MS. WILSON:**  Okay.  I don't have any further

3    questions, Your Honor, for the preliminary hearing.

4         **THE COURT:**  All right.  So let me hear argument

5    regarding probable cause.  Since it's your burden, Ms. Wilson,

6    why don't you go ahead and start?

7         **MS. WILSON:**  Yes, Your Honor.  Your Honor, the charge

8    here (indisc.) charges here are 924(c), possession of a firearm

9    with -- in furtherance of drug trafficking, as well as D-level

10   marijuana.  We've heard testimony today that at Mr. Guevara's

11   residence on January 18th of 2022, APD executed a search

12   warrant, that it's a one-bedroom apartment with his photographs

13   and documents, and that seven firearms, approximately 35 pounds

14   of marijuana, $58,000, and oxycodone pills, as well as a

15   fentanyl pill, were located there.

16        We've also heard testimony that that amount of

17   marijuana is not consistent with personal use.  And that some

18   of those firearms also returned as stolen and that it was --

19   that the firearms were located in the same bedroom as the

20   marijuana.  The marijuana was located in the closet and

21   firearms were located not only in the bedroom but there were

22   several located in the drawers in the bedroom, and then some

23   located in the living room as well.

24        We've also heard testimony with regard to

25   Mr. Guevara's smoke shop, that he provided the keys to the

1  smoke shop, and that APD also had a search warrant for that

2  smoke shop.  And that when they executed the warrant there,

3  they located 20 pounds of marijuana as well as three guns, and

4  at least one of those had also been reported stolen.

5        We heard testimony that that amount also is

6  inconsistent with personal use and consistent with trafficking.

7        We also heard testimony that those items were all

8  located inside of the back room of the smoke shop, which is a

9  very small area, and they were located together; that one of

10 those firearms had what appeared to be blood on it and that has

11 been -- that testing is pending, but that Mr. Guevara provided

12 -- or basically informed Agent Lopez that he had obtained that

13 particular firearm from a male after a shooting and he'd been

14 injured in his finger.

15       But, Your Honor, with regard to -- and that all of

16 these occurred in District of New Mexico.

17       So with regard to the level of probable cause, Your

18 Honor, the United States has established well beyond that.

19 We've established both those -- these two places belonged to

20 Mr. Guevara and that the amounts of marijuana seized were

21 trafficking amounts with -- consistent with possession with

22 intent to distribute.  And the firearms seized, as well as the

23 money and the other substance, also further indicate

24 trafficking.

25       Furthermore, the firearms located in proximity with

1  the controlled substances in both locations as well as the

2  other evidence that I've already mentioned also indicate

3  that -- provide probable cause for the 924(c) count, possession

4  of the firearms in furtherance of drug trafficking.  So with

5  that we'd ask the Court to find that the United States has met

6  its burden.

7          **THE COURT:**  All right.  Ms. Johnson.

8          **MS. JOHNSON:**  Thank you, Your Honor.  If I may,

9  first, with regard to the possession with intent to distribute

10  marijuana, Your Honor, we're talking about approximately 50

11  pounds (indisc.) more than that of suspected marijuana.

12  Mr. Guevara has a medical marijuana card.  Whether or not he --

13  there's evidence that he possessed this marijuana for personal

14  use, that's -- has not been definitively refuted.  I would

15  submit to the Court, Your Honor, that there really is no

16  evidence that, number one, Mr. Guevara possessed the marijuana.

17          Number two, it was found in a closet.  There were two

18  individuals in this apartment when APD detectives executed the

19  warrant.

20          The marijuana found in the business, again, it's a

21  business.  Presumably people work at the business.  There

22  really is no evidence connecting Mr. Guevara to this marijuana

23  other than Mr. Guevara being at the location where the

24  marijuana was found.  And simply being at the location where

25  drugs are found is not sufficient to establish possession with

1  intent to distribute.  There has to be some connection between

2  the drugs and the person being charged.

3          With regard to the 924(c), most definitively, Your

4  Honor, there is not sufficient evidence to support this charge

5  even by a probable cause standard.  I'm going to cite the Court

6  to several opinions that I think are important and instructive

7  on this issue.  Just having firearms in close proximity to

8  drugs is not enough to support a charge of 924(c).  In *United*

9  *States versus Shaw*, it's a Fifth Circuit opinion, 338 Federal

10 Appendix 404, the Fifth Circuit reversed a conviction because

11 the Government had failed to prove that the firearm was kept

12 for the purpose of furthering the trafficking of drugs.

13         There has been absolutely no evidence that

14 Mr. Guevara possessed firearms in furtherance of drug

15 trafficking offenses, that he carried firearms, that he was

16 known to carry firearms, no evidence that he was even the

17 person from whom the alleged controlled buys were made.

18         And with regard -- another case I'd like to direct

19 the Court's attention to is *United States versus Monzon*,

20 M-O-N-Z-O-N, 429 F.3d 1268.  It's a Ninth Circuit 2005 opinion.

21 Again the conviction was reversed because insufficient evidence

22 -- there was insufficient evidence to support the conviction.

23 The drugs had been found in a baby formula can in a closet,

24 similar to what we have in this case, and then the gun was

25 found under the defendant's bed covers.  The court reversed the

1   conviction because other than the gun being near the drugs,

2   there was absolutely no evidence to demonstrate that the guns

3   were possessed in furtherance of a drug trafficking crime.

4          This has been as of late a crime that has been abused

5   widely by prosecutors, that when they simply find a firearm and

6   they find drugs nearby, they charge the 924(c).

7          But really, when you look at *United States versus*

8   *Iiland*, which is a Tenth Circuit opinion, 254 F.3d 1264, the

9   Tenth Circuit noted in that case that the legislature meant a

10  higher standard for possession with -- for possession in

11  furtherance of a drug trafficking crime in the context of

12  924(c).  The Tenth Circuit noted in that case that the evidence

13  requires that there be a direct connection between the firearm

14  and the drug offense.

15         There's absolutely been no evidence presented to this

16  Court of a direct connection between the firearms and the drug

17  offense.  So simply having firearms and drugs in a closet, in a

18  closet I should note that where there were no firearms found,

19  is not enough to charge someone with an offense that carries a

20  minimum mandatory of five years.

21         And, finally, *United States versus Zavala*, Your

22  Honor, it's another Fifth Circuit opinion, again the weapon was

23  found in the same location as the drugs.  And other than that,

24  there was no other evidence connecting the weapons to the

25  drugs.  And the Fifth Circuit in that case, it's 286 Federal

1   Appendix 170, it's a 2008 Fifth Circuit opinion, reversed the

2   defendant's conviction.

3          I would respectfully request, Your Honor, that at a

4   minimum the Court dismiss the 924(c) count and find that there

5   is not sufficient probable cause to charge Mr. Guevara for that

6   offense.

7          **THE COURT:**  All right.  Thank you.  Ms. Wilson, it's

8   your burden so I'll give you the chance to have the last word.

9          **MS. WILSON:**  Thank Your Honor.  With regard to the

10  924(c), I won't reiterate the same things I said with regard to

11  the drug trafficking count.  I believe that it has been

12  established, as I stated, that these two locations, they belong

13  to Mr. Guevara, and that the -- so did the marijuana.  And I

14  think even with the -- all of the letters and everything that

15  was submitted, it was very -- it's been made abundantly clear

16  that this is Mr. Guevara's smoke shop.  So I don't really think

17  there is a question as to that.

18         With regard to the 924(c), the Tenth Circuit has

19  given some specific ways to evaluate the presence -- or whether

20  a firearm is the -- can be the foundation for a 924(c).  And

21  they do state that mere presence is not enough, and they say to

22  look at other things, not limited to this, but the type of

23  criminal activity that's being conducted, accessibility of the

24  firearm, the type of firearm, whether the firearm is stolen,

25  the status of the possession, whether the firearm is loaded,

1    the time and circumstances under which the firearm is found,

2    and the proximity to drugs or drug profits.

3            So here we have most of these factors weighing in

4    favor of a 924(c).  So we have the type of criminal activity,

5    which is drug trafficking.  We have high amounts of marijuana

6    that are not consistent with personal use  and that there --

7    that Mr. Guevara did not have a license to sell marijuana.

8            The firearms were highly accessible, they were spread

9    throughout the back room of the shop and available in the

10   bedroom in multiple locations and in the living room of the

11   home.  We had both handguns and long guns located throughout;

12   half of the handguns, five of them, were reported stolen.

13           And we had ammunition, several of the firearms were

14   loaded.

15           And these were located inside of -- again, inside of

16   his home and his smoke shop, and first thing in the morning

17   when Mr. Guevara was present and was not prepared to -- well,

18   when he was inside of his home at the very beginning of the

19   morning.

20           And, finally, the -- these were all in small

21   locations, close proximity to the drugs, and also close

22   proximity to the drug profits.  We're talking about $58,000,

23   which I would -- will reference this again during the detention

24   portion, but that kind of cash is not consistent with the --

25   what his reported income is.  And so these are drug profits,

1  and the guns were located in close proximity to those profits

2  as well.

3          So for all of those reasons I believe the Government

4  has met its burden as to both counts.

5          **THE COURT:**  All right.  So let me break down the

6  different charges.  So, first, with regard to possession with

7  intent to distribute a mixture or substance containing

8  marijuana, there is probable cause that 50 pounds of marijuana

9  is a distribution amount of marijuana.  I don't have any

10  trouble making that determination.

11         With regard to the marijuana that was in the house,

12  there was another individual in the home.  But the marijuana

13  was found in a closet in the bedroom that the Defendant

14  occupied.  And so between the two I certainly think there's at

15  least probable cause that the person who knew of and possessed

16  that marijuana was the person that was in the bedroom, that was

17  occupying the bedroom that's connected to the closet where the

18  marijuana was found.  It was a bedroom closet it sounds like.

19  So I don't have any trouble finding the possession given that

20  it was a distribution amount.  I think there's enough to

21  support probable cause with regard to the marijuana that was

22  found in the apartment.

23         I think the marijuana at the shop is a closer call

24  because he wasn't in the shop at the time.  You know, we --

25  there were other people that had access to the shop and five

32

1    other people.  We don't know how long the marijuana had been

2    there.  That being said, the testimony is that the marijuana

3    was disbursed throughout the shop in jars.

4              The evidence is that Mr. Guevara, even though there

5    were other people that had access to or worked in the shop,

6    that he was the one with the keys to the shop.  I suppose other

7    people also could have had keys.  But the evidence indicates

8    that he was the one that owned the shop and at least had

9    control to go in and out of the shop whenever he wanted because

10   he had the keys to open up the shop.  So given that, I think

11   that there's at least enough to support a finding of probable

12   cause with regard to the marijuana that was in the shop;

13   although I think that's a closer call.

14             With regard to the 924(c), both counsel I think are

15   right when they state the law.  Looking at the Tenth Circuit

16   instruction on 924(c), it says a firearm plays an integral part

17   in the underlying crime when it furthers the purpose or effect

18   of the crime and its presence or involvement is not the result

19   of coincidence.  The Government must prove a direct connection

20   between the defendant's use of the firearm, use or carrying of

21   the firearm, and the underlying crime, but the crime need not

22   be the sole reason the defendant used or carried the firearm.

23   So, again, we're dealing with a probable cause standard.

24             With regard to the guns that were found in the living

25   room, because there was somebody else that the evidence was

33

1   crashing, so I'm assuming was sleeping in the living room, if

2   we're just talking about those guns I would have much more

3   trouble finding probable cause.

4         With regard to the guns in the shop, I think that's a

5   closer call than the guns in the bedroom, again because the

6   guns in the shop were -- again, I don't know when those guns

7   were put there but at least there is evidence that Mr. Guevara

8   knew of the one gun in the shop, the one -- the gun with the

9   high capacity drum and the blood on it because he spoke to

10  Agent Lopez about it.  So he at least knew that that gun was

11  there together with the marijuana.

12        The probable cause determination on the 924(c) is

13  easier for me with regard to the guns that were in that

14  bedroom, even though they weren't in the closet.  It -- they're

15  all within that bedroom.  So you got the marijuana in the

16  closet, you've got the guns in drawers that are not far from

17  the marijuana that was in the closet.

18        In addition, the factors that you pointed out,

19  Mr. Wilson -- or Ms. Wilson, several of them exist.  For

20  instance, the guns were -- several of the guns were stolen,

21  they were accessible, they were next to distribution amounts of

22  illegal substance.  And the -- several of the firearms were

23  loaded.  And then also they were close to a large amount of

24  cash, which would be consistent with drug trafficking.

25        And so I think all those factors when you combine

34

1    them together are at least sufficient to establish probable

2    cause.  So I'll also find that there's probable cause to

3    support the 924(c) charge in this case, which then takes us to

4    the issue of detention.

5            And, Ms. Wilson, I know that you were going to ask

6    Special Agent Lopez some questions with regard to detention.

7    If you want to do that, I'll let you go ahead and do that.

8    Alternatively, if you wanted to proffer information, I would

9    also let you do that.

10           **MS. WILSON:**  Okay, Your Honor.  I guess I can go

11   ahead and proceed by proffer in the interest of time.  And then

12   if we have any further follow-up questions, I'll just ask that

13   Agent Lopez remain available for us.

14           **THE COURT:**  Okay.  Let me ask you, Ms. Johnson.  Did

15   you have questions that you wanted to ask directly Special

16   Agent Lopez with regard to detention?

17           **MS. JOHNSON:**  Not at this time, Your Honor.  I think

18   what Ms. Wilson proposes is acceptable.  She can proceed by

19   proffer, and then if I do have follow-up questions for the

20   agent, if she could remain available for that.

21           **THE COURT:**  Okay.  So, Special Agent Lopez, obviously

22   don't hang up.  You don't have to keep your video on if you

23   don't want, or your microphone, but you're welcome to if you

24   want as well.  All right.  Go ahead, Ms. Wilson.

25           //

1              **MS. WILSON:**  Thank Your Honor.  So in addition to the

2    facts that Your Honor just heard through the preliminary

3    hearing, I'd like to highlight a few other things.

4              Pretrial Services did prepare the report for today.

5    And I actually counted six failure to appear warrants or

6    failures to appear, three of which were warrants and three of

7    which were summons, in previous cases in State Court.  I also

8    counted it looked like four misdemeanor convictions.

9              And then there were also some concerning domestic

10   violence incidents, one of which that did involve an order of

11   protection.  And what the mother of the children in that case

12   had filed the order of protection in 2020, she did reference

13   inside of that that Mr. Guevara has a reckless life of drug

14   dealing and abuse and alleged that he gave their children

15   drugs.  Obviously that's a separate matter inside of family

16   court.  However, that -- and that order of protection was

17   active through October of 2021.  And there were failures to

18   appear in that matter as well.

19             There is also some other information that Agent Lopez

20   had actually been familiar with Mr. Guevara previously with

21   regard to the homicide case involving Chase Smothermon and

22   Mariah Ferry.  And there was I believe there was also a --

23   there was information for -- that Agent Lopez had as with

24   regard to Mr. Guevara providing a flash drive actually

25   depicting the mutilation in that case that he had in error or

1    accidentally provided to the DA's office rather than the

2    defense attorney.

3           And that he was supposed to be bringing the flash

4    drive in order to help assist with Mr. Smothermon's defense in

5    some way because he was about to be, you know, have his case go

6    south on him or something to that effect, and that he was --

7    yeah, trying to assist in that defense by providing -- and so

8    it indicates that he -- if nothing else indicates that he is

9    involved with the same people that were -- that committed this

10   horrific crime and that those people are part of, and Guevara

11   included, an extensive network that involves, you know, things

12   like violent crimes, child pornography, drug and firearms

13   trafficking, and this homicide that has already been resolved

14   in Federal Court where three people were convicted.

15          Furthermore, Your Honor, I'd like to highlight the

16   fact that -- well, in that case that Mr. Guevara, as far as the

17   Federal case, did have to be tracked down by agents in order to

18   get him to appear in Federal Court, and that that was quite an

19   ordeal as well.

20          With regard to the smoke shop that Mr. Guevara owns,

21   there -- you know, obviously the indication with regard to a

22   bloody firearm and that someone coming with a bloody firearm

23   and handing it off to Mr. Guevara and Mr. Guevara accepting

24   that I think indicates again a pattern of assisting with

25   covering up criminal activity and, even if not being trigger

1    man himself, being involved in trying to conceal violent

2    activities that occur here in our community.

3         And there's also information about another, you know,

4    deadly shooting that occurred at a smoke shop on San Pedro just

5    about a mile from Mr. Guevara's that I think indicates -- you

6    know, that really shows that it's not just, you know, just

7    trafficking marijuana.  When we have these issues with firearms

8    incorporated in with the trafficking, it becomes a very

9    dangerous community -- dangerous for our community.

10        And I have great concerns over the stolen firearms as

11   well because, again, it indicates that Mr. Guevara is not

12   concerned with the legality of having the firearms or how he

13   obtains the firearms or what those firearms were used for

14   before he obtained them.

15        And as I mentioned a little bit earlier, the $58,000

16   located, this does not line up with his reported income in the

17   Pretrial Services Report.  This further indicates that he is

18   drug trafficking, that he obtains these funds through drug

19   trafficking, and that he can generate large sums and does have

20   the ability to disappear and not appear for court and face the

21   crimes that he's been charged with.

22        So for all of those reasons, Your Honor, we are

23   asking for detention.  Sorry, you're muted, Judge.

24        **THE COURT:**  Usually I'm the other one -- usually I'm

25   the one saying that so thanks, Ms. Wilson.

1        Ms. Johnson, would you like to talk to your client

2   before I hear any argument from you or do you think you're

3   prepared to go ahead and respond?  Again, we're on video so I

4   want to try to give you every opportunity if you need it.

5            **MS. JOHNSON:**  Your Honor, I am prepared to respond.

6   I would like to question the agent about this -- one of the

7   items that Ms. Wilson proffered to the Court.

8            **THE COURT:**  All right.  Any objection, Ms. Wilson?

9            **MS. WILSON:**  (No audible response)

10            **THE COURT:**  Okay.  I could see --

11            **MS. WILSON:**  No, Your Honor.

12            **THE COURT:**  -- what you said -- that you said "no."

13   I could read your lips there.  Okay.

14            Special Agent Lopez, you're still under oath.  Go

15   ahead, Ms. Johnson.

16                        **RECROSS EXAMINATION**

17   **BY MS. JOHNSON:**

18   Q    Agent Lopez, just briefly.  You are aware that Mr. Guevara

19   was not connected to the homicide involving Chase Smothermon,

20   correct?

21   A    The actual homicide?

22   Q    Yes.

23   A    I was the case agent on that -- in that case just -- so I

24   am familiar with Guevara, I'm familiar with his role in this.

25   So in the actual homicide he was not.  He was aware of what was

Lopez - Recross / By Ms. Johnson                    39

1    on that thumb drive and he had --

2    Q    Wait, hold on, hold on, hold on.  Let me ask you a couple

3    questions, okay?  So you also are aware that the person who

4    actually took the thumb drive to the DA's office was a female

5    who was being accompanied by Mr. Guevara, correct?

6    A    Guevara is the person who actually handed the thumb drive.

7    He's on video with her.  They talked to the people.  He said he

8    was paid to do that.

9    Q    But he was with the female, right?

10   A    He was with a female, yes.

11   Q    Okay.  And in fact Mr. Guevara was interviewed in

12   connection with the Smothermon investigation, correct?

13   A    Yes.  He was interviewed.

14   Q    And he was not charged with any crime with regard to that

15   investigation, correct?

16   A    He was not charged, no.

17   Q    Okay.  And he remained in Albuquerque the entire time that

18   you and other agents conducted that investigation, correct?

19   A    I don't know because I couldn't find him.

20   Q    But you eventually found him, right?

21   A    Yes.  I eventually --

22   Q    And you found -- I'm sorry, didn't mean to cut you off.

23   A    No, I eventually found him after a lot of work.

24   Q    And you found him in Albuquerque, right?

25   A    I don't know where he was.  I found him over the phone.

1    He called me.

2    Q    Okay.  So he actually reached out to you then.

3    A    After I had him reach out to me because we had a warrant

4    for him.

5    Q    Now, let me ask you something that Ms. Wilson said.  What

6    evidence -- do you have any evidence that connects Mr. Guevara

7    to child pornography?

8    A    No.  I have evidence of his relationship with this network

9    of people.

10   Q    And who's the network of people?

11   A    Chase Smothermon, Ricky Bobby Montano (phonetic), Jennie

12   Montano (phonetic), Mariah Ferry, Cherry Aleway (phonetic).

13   Q    You actually know that Mr. Guevara doesn't know

14   Mr. Smothermon, correct?

15   A    He tells me he doesn't but I have other information from

16   my case.

17   Q    And, again, he was not charged in connection with that

18   Smothermon case, right?

19   A    He was not charged.

20   Q    Okay.  And this shooting that Ms. Wilson talked about that

21   had occurred about a mile from the smoke shop Mr. Guevara owns,

22   there's no evidence that was connected to Mr. Guevara's smoke

23   shop or Mr. Guevara, correct?

24   A    Not currently, no.  I still need to send all the firearms

25   to the lab.

1        **MS. JOHNSON:**  Okay.  All right.  Thank you, Agent.  I

2   have no further questions.  Your Honor, I have argument now.

3        **THE COURT:**  Go ahead.  Thank you, Ms. Johnson.

4        **MS. JOHNSON:**  Your Honor, I would submit to the

5   Court, and I don't know if the Court has --

6        **THE COURT:**  Well just a second.  Just out of fairness

7   let me ask you, Ms. Wilson, did you have a redirect to anything

8   that Ms. Johnson asked?

9        **MS. WILSON:**  No, Your Honor.

10       **THE COURT:**  Okay.  All right.  Thank you.  Go ahead,

11  Ms. Johnson.

12       **MS. JOHNSON:**  Thank Your Honor.  Your Honor, with

13  regard to the failures to appear, Mr. Guevara always appeared

14  in court.  There do appear to be some failures to appear but he

15  always took care of those cases.

16       He doesn't have any felony convictions.  It seems

17  like actually most of those cases that are on the Pretrial

18  Services Report have been dismissed.

19       Also, Your Honor, with regard to the order of

20  protection, I would submit to the Court that the Court give it

21  very little weight.  It was an allegation made by an ex-

22  girlfriend in family court.  Obviously they are disputing

23  custody of the children so as we all know in family matters,

24  people will say inflammatory things about the other person.  So

25  I would ask that the Court give that little weight.

1          With regard to this alleged Smothermon, I finally --

2    I actually find that troublesome that they are trying to link

3    Mr. Guevara to this Smothermon case.  When he was actually

4    interviewed, he was cooperative.  He actually turned this flash

5    drive over to the District Attorney's Office, and he was

6    cleared.  He was not indicted, he was not charged, and there's

7    no evidence.  In fact, the agent admitted that Mr. Guevara

8    maintains he doesn't know this Chase Smothermon individual.  So

9    to bring that to the Court's attention I would submit to the

10   Court is just simply improper because Mr. Guevara was never

11   charged with anything.  He was never charged as an accessory.

12   He wasn't connected to the murder.

13          And really to also throw in child porn is quite

14   inflammatory and frankly quite outrageous because there's no

15   evidence that Mr. Guevara is connected to any child pornography

16   or any homicides.

17          And then the shooting, it happens about a mile from

18   the smoke shop he owns, no evidence he's connected to it

19   either.  So simply what the Government is doing is trying to

20   throw out these inflammatory statements so that the Court will

21   hold Mr. Guevara in custody.

22          So the person that really is before the Court, Your

23   Honor, is detailed in the letters that were submitted to the

24   Court.  And there was also an article that was submitted to the

25   Court that demonstrates that Mr. Guevara actually is a very

43

1    community and -- community-minded individual.  He has done

2    charitable works.  I believe that one of the news stories that

3    was submitted to the Court featured Mr. Guevara providing

4    things to family, food, gifts to families in need during

5    Christmastime.

6        The letters that were submitted to the Court also are

7    from people who have known Mr. Guevara; not in a very limited

8    time period and in a vacuum but for many years.  And they quite

9    frankly describe a different person.

10       Yes, he's had some brushes with the law.  But he's

11   not a convicted felon, Your Honor.  And there are conditions

12   that can be fashioned that would ensure that he is not a danger

13   to the community and that he will show up for court.  He's a

14   long -- a lifelong resident of New Mexico.  He has never left

15   the United States, doesn't even have a passport, always

16   appears, granted he does have some failures to appear, but

17   always appears for his court hearings.

18       He knows the seriousness of this charge.  He is going

19   to appear.  He retained counsel long ago, right after the State

20   search warrant was executed.  He maintains contact.

21       Your Honor, I would submit to the Court that the

22   Court either release him to the third party custody of his

23   sister whom Pretrial Services has found to be a suitable third

24   party custodian or, in the alternative, to the halfway house

25   because the halfway house would ensure, number one, that he

44

1    isn't out in the community all the time, he will be strictly

2    supervised at the halfway house, but also will allow him the

3    opportunity to meet with counsel so that we could prepare his

4    defense.

5            Given his limited criminal history, this is a

6    marijuana case, 50 pounds of marijuana, Your Honor.  Yes, there

7    were several firearms found.  But he's not a convicted felon.

8            And these other arguments that have been tendered to

9    the Court or proffered to the Court about these other crimes

10   that he was not connected to or charged in connection with I

11   would submit to the Court should not factor into the Court's

12   analysis.  I would respectfully request, Your Honor, that the

13   Court release Mr. Guevara either to his sister or to the

14   halfway house.

15           **THE COURT:**  All right.  Thank you.  Now let me ask

16   you because you said he's taken care of, you know, any time

17   there's a failure to appear.  The Pretrial Services Report

18   indicates that there's an active warrant that was issued in

19   2018 (indisc.) so that would indicate that that has not yet

20   been resolved.  I just want to give you a chance to follow-up

21   on that.

22           **MS. JOHNSON:**  If I may, Your Honor, if I can just

23   take a look --

24           **THE COURT:**  Sure.

25           **MS. JOHNSON:**  -- at that.

1          **THE COURT:**  It's the very last sentence in the

2    Pretrial Services Report.

3          **MS. JOHNSON:**  Okay.  That looks like it's traffic

4    charges, Your Honor.  There -- I don't know if there's an

5    indication that he was even aware that he has this warrant.  I

6    can represent to the Court that if released, he will take care

7    of this warrant.  It looks like it's just for traffic tickets

8    so it's possible he may have been summonsed and maybe did not

9    receive notice.  I don't know, Your Honor.  I can't represent

10    to the Court the circumstances behind that.

11          **THE COURT:**  Okay.  That's fine.  All right.

12    Ms. Wilson.

13          **MS. WILSON:**  Yes, Your Honor, just a couple of things

14    to address briefly.

15          Defense counsel had stated that the involvement in

16    the Smothermon case is not relevant.  Your Honor, I would

17    submit to the Court that the evidence of Mr. Guevara's

18    involvement in that case is at least, if not far more, relevant

19    than letters from people who have no information about what

20    Mr. Guevara does behind the scenes or what his actual business

21    is for making an income like $58,000.  And so I think that it

22    is completely appropriate for the Court's consideration, and

23    also show a pattern of assisting with, you know, covering up

24    criminal behavior.

25          Also -- and defense counsel had also stated that he

1    was cooperative in the Smothermon case.  But I wanted to point

2    out that Agent Lopez's testimony was that she only received a

3    phone call from him after she had gotten a warrant for him and

4    had worked for several months in order to get him -- to get

5    that phone call.  So I don't think that characterizing it as

6    completely cooperative is a fair characterization.

7            But other than that, Your Honor, I don't have

8    anything further.

9            **THE COURT:**  All right.  Let me go through the factors

10   of -- first of all, this is a presumption case because of the

11   924(c) charge.  It's not a presumption based on the drug

12   trafficking because it's a D-level offense and so the maximum

13   penalty isn't high enough to make that a presumption case.  But

14   it is a presumption case based on the 924(c).  I am finding

15   that the defense has submitted sufficient evidence to rebut

16   that presumption, both based on his community ties, his lack of

17   criminal history, you know, the various arguments that

18   Ms. Johnson made.

19           Going through the factors that I have to consider in

20   deciding whether he should continue to be detained, first, I

21   look at the nature of the offense.  Looking at the drug

22   trafficking, that's a D-level marijuana charge.  You know,

23   particularly now that New Mexico -- and I realize it's not

24   legal on the Federal government but certainly is much easier

25   for people to get marijuana in New Mexico than it used to be.

1    So given that the charge is D-level marijuana, that is not as

2    serious as a lot of the charges I see.

3            What is much more serious is the charge of the

4    924(c), using a gun in connection with drug trafficking.  So

5    that is a serious offense that weighs in favor of the

6    Government.

7            With regard to the weight of the evidence, with

8    regard to the marijuana distribution and trafficking, given

9    that he had access to the smoke shop, he wasn't just simply an

10   employee, he was -- you know, at a minimum had one set of keys

11   to that smoke shop, that there was, you know, jars of marijuana

12   disbursed throughout the smoke shop.  And then he also had

13   almost 40 pounds of marijuana within his apartment in

14   connection with just under $60,000.  I do think that that

15   evidence of drug trafficking is strong.

16           I think the evidence of the 924(c), for the reasons

17   that Ms. Johnson articulated, while there's probable cause,

18   that is not as strong.  And then as I stated earlier, I think

19   the strength of the evidence varies depending on which guns

20   we're talking about.

21           So looking at the Defendant's personal history, which

22   is really the biggest factor for me that this is going to turn

23   on, it -- well, I was going to say something else (indisc.) the

24   evidence but I think I'll just rest on what I've said so far.

25   Related to the personal history, I mean, what we have is a 40-

1    year-old who has never been convicted of any felony.  He does

2    have a number of arrests, some misdemeanor issues.  But he has

3    never been convicted of a felony.  Certainly the Government's

4    not making an allegation that he was a felon in possession of

5    any of those firearms.

6         He does have close ties to the community.  He does

7    have family here in New Mexico.  He's got, you know, strong

8    ties to the community.

9         Although it sounds like he was recently unemployed,

10   although that's not clear to me because it sounds like he owns

11   a smoke shop that was at least making some money.  But looking

12   at the Pretrial Services Report, well, it does look like that

13   is -- it is up to present.  So the employment weighs in his

14   favor here.  So all of those factors weigh in his favor.

15        It doesn't appear that he has any history of drug or

16   alcohol abuse or addiction and -- or mental health issues that

17   would require him to be detained.  So I -- all of that weighs

18   in his favor.

19        I am concerned about the fact that it sounds like

20   there's a current active arrest warrant, whether it's for

21   traffic issues or not, and that there's a number of other

22   failure to appears.

23        With regard to the danger, one of the other factors

24   that makes me concerned is that not only were there a number of

25   firearms but several of those firearms were stolen.  So the

1    Government has repeatedly raised that point and I think that's

2    a valid point.  That provides me concerns that there's a danger

3    to the community.

4          So I don't think that release to his sister as a

5    third party custodian would be appropriate given the

6    information in this case.  I think that any release would be

7    more -- would need to be more structured.

8          So then the question for me is whether release to the

9    halfway house would be appropriate.  Considering that I have to

10   make a decision that is the least restrictive means necessary

11   to assure his appearance in court and safety of the community,

12   I do think that release to the third party custody of the La

13   Pasada Halfway House would accommodate my concerns.  It

14   addresses the concerns about him being a danger to the

15   community because clearly he's not going to be able to have

16   firearms while he's at the halfway house.

17         To the extent the Government's allegations are that

18   he was drug trafficking out of his smoke shop and out of his

19   apartment, again, he's not going to be able to do that while

20   he's working at the La Pasada Halfway House or while he's

21   residing at the La Pasada Halfway House.

22         With regard to the flight risk, I do credit Special

23   Agent Lopez's testimony that there was actually a warrant for

24   him and that -- now, I don't know that he knew that there was

25   actually a warrant or not but presumably he found out at some

1    point because he called her and got in touch with her.

2           I agree with you, Ms. Wilson, that if she was trying

3    to look for him and, you know, most of the time that means

4    you're talking to people that he knows that then probably relay

5    that information to him, and it sounds like it took a long time

6    for Special Agent Lopez to find him, that does add to my

7    concerns about flight risk.

8           But if he's at the halfway house where he's under

9    restrictions and he's more accountable, I think that alleviates

10   my concerns of flight enough that it's the least restrictive

11   means to make me think that it's likely that he'll appear at

12   future court proceedings.

13          So for all those reasons I'm going to order that he

14   be released to the third party custody of the La Pasada Halfway

15   House.  I do know that the halfway house isn't accepting people

16   at the moment so -- because they've had an outbreak of

17   coronavirus.  And so I think they aren't accepting people until

18   the 24th and so there's going to be at least some period of

19   time that he'll have to remain in custody before space is open

20   at the La Pasada Halfway House.

21          But, Mr. Galaz, let me let you address this or any

22   other issues that you wanted to discuss given my decision.

23          **U.S. PRETRIAL SERVICES OFFICER GALAZ:**  No, Your

24   Honor, that's sort of a (indisc.) that could change hopefully.

25   So if that does, he would actually get out on the 18th.  But

1  let me double-check on that.  We may be able to -- because it

2  looks like his arrest date was on the 4th so we may be able

3  (indisc.) La Pasada on the 18th.  But let me just follow-up

4  with our liaison at the halfway house because I know it looks

5  like things are in the right direction over there so we might

6  be able to get him on the 18th.  But I'll double-check and let

7  the Court know on that.

8       **THE COURT:**  All right.  So obviously one concern I

9  have, I want him to be working.  I have concerns about him

10 working at the very smoke shop that the Government is alleging

11 was the area through which he was drug trafficking.  So, you

12 know, if there's evidence that he -- I'm not sure if he owns

13 it.  It looks like in the Pretrial Services report, it says

14 that he's the owner, which creates more of a dilemma.  It's not

15 simply somebody who's an employee that can't -- that has to

16 find a different job.  But I do have concerns about him going

17 to that smoke shop.  And I don't know what the status of it is

18 now.  After there's been a search warrant it may not even be in

19 operation.  Let me ask you, Ms. Johnson, is that even an issue?

20      **MS. JOHNSON:**  No, Your Honor.  I did have that

21 discussion with Mr. Guevara this morning, that if the Court

22 were inclined to release him that I would strongly urge him to

23 not return to the smoke shop and to find different employment.

24 And he was agreeable to that.  I would have to speak with his

25 sister about what the status of the shop is.  But I don't

1    believe that Mr. Guevara would have a problem not returning, at

2    least during the pendency of this case, to the smoke shop and

3    finding alternative employment.

4              **THE COURT:**  All right.  And I would make that part of

5    my order.  But let me ask you, Ms. Wilson.  Are there other --

6    other than the standard conditions, are there other conditions

7    that you would encourage me to impose in this case?

8              **MS. WILSON:**  Your Honor, I think you covered it

9    (indisc.) standard.  I would have asked exactly what you just

10   addressed as far as the location of the smoke shop and that he

11   not be there at all.  And then the rest of them are pretty

12   self-explanatory as far as possession of drugs and firearms.

13             **THE COURT:**  All right.  Thank you.  All right.

14   Mr. Galaz, do you have anything I'm missing?

15             **U.S. PRETRIAL SERVICES OFFICER GALAZ:**  No, Your

16   Honor.  I think you hit on everything, Your Honor, thank you.

17             **THE COURT:**  All right.  Anything at all then today,

18   Ms. Wilson?

19             **MS. WILSON:**  Nothing further from the Government,

20   Your Honor.  Thank you.

21             **THE COURT:**  Okay.  Thank you.  Ms. Johnson.

22             **MS. JOHNSON:**  Nothing further from the defense, Your

23   Honor.  Thank you.

24             **THE COURT:**  Okay.  All right.  That's all we'll have

25   in this case today then.  Thank you very much.

(This proceeding was adjourned at 11:48 a.m.)


### CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    **March 11, 2022**

         Signed                                        Dated



*TONI HUDSON, TRANSCRIBER*