IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>GABRIEL GUEVARA, )<br>)<br>Defendant. ) | CRIMINAL NO. 23-CR-00776-KWR |

**UNITED STATES' RESPONSE TO DEFENDANT GABRIEL GUEVARA'S MOTION FOR DOWNWARD VARIANCE IN SENTENCE AND SENTENCING MEMORANDUM (DOC. 51)**

The United States respectfully submits its response to Defendant's Motion for Downward Variance in Sentence and Sentencing Memorandum (Doc. 51) (hereinafter "Sentencing Memorandum"). The advisory guideline range is 46-57 months, as calculated in the Presentence Report (PSR). After careful consideration of the Section 3553(a) factors, the United States asserts that 57 months of imprisonment, a $10,000 fine, and $1,000 in community restitution is the appropriate sentence in this case.

**BACKGROUND**

In January 2022, APD detectives working on a narcotics investigation arranged for a confidential informant to purchase fentanyl pills from the residence and smoke shop of Defendant.[1] On January 18, 2022, APD detectives executed a search warrant at both locations. In Defendant's residence, detectives located seven firearms loaded with ammunition, approximately 35 pounds of marijuana, one fentanyl pill, 57 oxycodone pills, 3 grams of cocaine, and $58,293 in cash. In the

---

[1] Information from this paragraph references information from PSR, ¶¶ 9-14, and items depicted in Exhibit 1 (photos from the search warrant executions).

1

smoke shop, detectives found three more firearms and approximately 20 more pounds of marijuana. Out of the ten firearms seized, five of them were stolen. The ABC-15 rifle had blood stains on it. The oxycodone pills were sent to a laboratory for testing and were confirmed to be 5.261 grams of fentanyl. The cocaine and marijuana were field tested with positive results.

On May 25, 2023, Defendant plead guilty to an information charging Defendant with Possession with Intent to Distribute Marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D). In the plea agreement, the parties agreed that a sentence of no more than 60 months' imprisonment is the appropriate disposition of this case.

Defendant spent a total of 26 days in custody, including time he spent in custody before he was charged federally and taken into federal custody.[2] Defendant is requesting a sentence of time served. The United States asserts that a sentence of 57 months is appropriate.

## ARGUMENT

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining what constitutes an appropriate sentence for Defendant. *See United States v. Booker*, 543 U.S. 220 (2005). In requesting the Court impose a sentence of time served – or a meager 26 days in custody – Defendant asks this Court to grant a 15-level downward variance. This is wholly unsupported based on the facts and circumstances of this case, as well as in light of Defendant's history and characteristics. In fact, a consideration of the 3553(a) factors in this case should lead to the conclusion that a sentence at the high end of the properly calculated range – or 57 months – is sufficient but not greater than necessary to achieve the objectives set forth in Section 3553(a).

---

[2] PSR, page 1.

I.    The Nature and Circumstances of the Offense

The PSR accurately summarizes the evidence in this case, and Defendant has not lodged any objections to the PSR. Defendant possessed approximately 56.14 pounds of marijuana, 53 oxycodone pills, ten firearms, and $58,293. Five of the firearms had been reported stolen; eight were loaded. Several of the firearms had high-capacity magazines that hold over 50 rounds of ammunition.

The investigation of Defendant began as a fentanyl distribution investigation through the Albuquerque Police Department (APD). APD applied for and obtained a search warrant for both locations. In a fortuitous turn of events for Defendant, he was not in possession of a large amount of fentanyl pills as expected when the search warrants were executed at his residence and smoke shop. However, law enforcement did encounter the other controlled substances and numerous firearms listed above.

Defendant had ten firearms and acknowledged that he uses them for protection. Defendant knew that drug-dealing is a dangerous activity but he chose to keep these firearms and drugs in his home and in his business that he presented to the community as a legitimate business. Drug trafficking creates a market where dealers have to compete with other dealers, protect themselves, their product, and their profits. This includes marijuana and illegal marijuana sales are common. Defendant, as the child of a substance abuser and by his own account a former addict, is also fully aware of how drugs and drug trafficking can destroy lives including his own. And yet, he chose to continue trafficking drugs himself and subjecting his own community to the effects.

II.     History and Characteristics of Defendant

The version of Defendant portrayed in Defendant's Sentencing Memorandum and in the letters of support is but one side of Defendant, and extremely generous at best. Unfortunately, the vast majority of defendants who appear before this Court to be sentenced have suffered tragic and unfortunate life events. While not minimizing the struggles Defendant has experienced, he is nonetheless responsible for the choices he has made. As a 42-year-old man, he has had decades to choose another path and has chosen not to do so.

Defendant has a lengthy criminal history ranging from his juvenile years all the way until this case: 1999 (two cases), 2002, 2005 (two cases), 2013, 2016, 2019, and 2020. Even at age 37, Defendant was still shoplifting. A large portion of his cases were dismissed and he faced little to no consequences on the cases in which he was convicted. Out of Defendant's nine criminal cases before the instant case, six were dismissed. Defendant's three misdemeanor convictions resulted in far less than a year in total confinement time. Defendant's continued and unbated arrest history that spans decades demonstrates that Defendant learned from all of these experiences not to take the law seriously.

Defendant would also like the Court to believe he is an active father and takes care of his family. Defendant's history indicates otherwise. Part of Defendant's criminal history includes instances of domestic violence and abuse.[3] In August 2020, a petition for order of protection from domestic abuse[4] was filed against Defendant. The petitioner alleged that Defendant carried a firearm, provided drugs to at least one minor child, and took the children to smoke weed. The

---

[3] See, e.g., charge of Assault on a Household Member in 2005 (dismissed); charge of Battery Against a Household Member in 2002 (dismissed).
[4] See Exhibit 2 (Petition for Order of Protection).

4

petitioner stated that she had full custody of her children with no visitation granted, and that Defendant was a danger to her children and had not been an active father or member of the children's lives since the day they were born. The petitioner also expressed fear for her children's safety because of the "wreckless life of drug dealing and abuse" which led to her filing for full custody of the children in the first place. The petitioner further alleged that Defendant did not work or pay child support or taxes. The petitioner located communications from Defendant to the children and learned that he had been picking them up in secret and taking them to a shop to smoke and giving them drugs and paraphernalia. Petitioner also stated that Defendant owed $60,000 in child support and had no legal right to see the children. In August 2020 and October 2020, a no contact temporary restraining order was issued against Defendant.[5] Defendant was ordered to appear and failed to. An order prohibiting domestic violence was issued on October 2020. This order expired in October 2021.

     Defendant also claims that he stopped consuming all substances approximately five years ago.[6] Undersigned attorney finds this claim suspicious considering that in this case Defendant had 57 oxycodone pills, one fentanyl pill, and approximately three grams of cocaine in his home along with approximately 35 pounds of marijuana. It is even harder to believe when one considers that marijuana and cocaine are Defendant's drugs of choice[7] and his aspiration (that was eventually achieved) was to run a smoke shop wherein marijuana paraphernalia was a prominent sale item. In addition, Defendant had two missed drug tests and two diluted drug tests within the last year.

---

5 See Exhibit 3 (register of actions).
[6] PSR, ¶ 60.
[7] PSR, ¶ 60.

Defendant would also like the Court to believe that he is just unlucky or happens to be in the wrong place at the wrong time, or perhaps just ignorant of criminal activity around him. However, Defendant is not "drawn into"[8] these bad groups or scenarios as he would like the Court to believe. He draws people to him. He chooses to engage with some of the most heinous criminals in Albuquerque—in fact, he chooses to assist them in avoiding consequences for their criminal behavior.

For example, in March 2018 Defendant mistakenly went into the Second Judicial District Attorney's Office and delivered a flash drive depicting the beating and ultimate murder of the victim in the Chase Smothermon homicide case.[9] FBI Agent Lopez explained at the detention hearing that Defendant was interviewed about his involvement in the Smothermon case, with the network of people involved, and but that he was not ultimately charged.[10] Agent Lopez also explained that during the investigation law enforcement had a warrant for Defendant for his failure to appear as subpoenaed, and that he only appeared after the warrant was issued.

As another example of such behavior, Defendant was in possession of a gun that was used in a violent crime. In the instant case, ten firearms were in Defendant's possession. Five of these firearms had been reported stolen. One of these firearms had blood on it. FBI agents executed a search warrant to obtain Defendant's buccal swab for a DNA analysis and comparison. Defendant asked why agents were taking swab samples from Defendant.[11] The FBI agent explained that it was because there was blood on one of the firearms that were seized from

---

[8] Doc. 52-1, page 1, letter from Roberto Ruiz.
[9] https://www.justice.gov/usao-nm/pr/chase-smothermon-sentenced-45-years-abducting-torturing-and-killing-one-victim-brutally
[10] See Exhibit 4 (transcript of preliminary and detention hearing), pages 38-40.
[11] See Exhibit 5 (report regarding Defendant's arrest by FBI).

him. Defendant stated that it was not his blood. Defendant said that he got the firearm from his friend and that it was his friend's blood. Defendant provided a nickname and description for his friend but did not provide his friend's name. Defendant explained that his friend was shot in the finger, and he believed his friend and another individual were shooting at each other. Defendant stated that the incident happened in the "war zone" and that no one was seriously injured.[12] After the shooting, Defendant's friend gave Defendant the firearm. Defendant described the firearm to which he was referring as a black, long firearm. Defendant claimed he did not think that was an issue because he was not a felon. However, Defendant acknowledged that he knew his friend had been shot and that his friend was trying to get rid of that firearm after the shooting. Defendant stated that he likes purchasing firearms. Defendant said people come by selling firearms and he buys them. Defendant denied selling firearms. Defendant said he keeps the firearms for security.

    Undersigned attorney does not know precisely how Defendant obtained all of these firearms, but it is safe to say that he did not purchase at least half of the firearms legitimately. In fact, he stated as much. He also did not seem to be the slightest bit concerned about the possibility of firearms he buys on the streets being stolen. This again demonstrates Defendant's willingness and desire to engage with and encourage the criminal element in Albuquerque and that Defendant and his smoke shop are a hub for criminal activity—criminals come to him knowing he will be willing to help.

---

[12] The FBI case agent did obtain information from the Real Time Crime Center identifying approximately five (5) instances where the "shotspotter" was activated in the vicinity of Defendant's smoke shop between October 2021 and December 2021, but could not find police reports related to the shooting. FBI case agent spoke with an APD homicide detective who was investigating a homicide that occurred about a quarter mile from Defendant's residence in October 2021. During this investigation, the detective identified a homicide suspect, who was allegedly involved in a separate shooting a month earlier, around September 2021. That separate shooting allegedly happened in a nearby smoke shop. Based on the FBI case agent's online searches, Defendant's smoke shop, residence, and location of the homicide are all within approximately one-half mile.

This is all in stark contrast to the man described in the letters of support who hosts coat drives and school supply drives in his community. One will notice that the letters of support do not include letters from any of Defendant's own five children. This speaks volumes. It is one thing to show your care for the community when it suits you. It is another to care for your own children, avoid all criminal activity, and live a clean life 24/7. Undersigned counsel is not sure if Defendant's youngest daughter was living with Defendant at the time of the offense in this case,[13] but if she was, Defendant had large amounts of marijuana, oxycodone pills, cash from drug proceeds, unsecured guns, stolen guns, and ammunition in the house with her. Defendant kept $58,293 in cash at his apartment. It is doubtful that Defendant planned to report this income on his taxes since it could not be supported by his quasi-legitimate business. Despite the smoke shop and Defendant's drug trafficking bringing in revenue, Defendant was not paying his child support obligations. Upon information and belief, undersigned attorney believes Defendant owes thousands upon thousands of dollars in child support.

Defendant's history and characteristics weigh heavily in favor of the 57-month sentence requested by the United States.

  III. <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Provide Adequate Deterrence, and Protect the Public from Further Crimes of Defendant</u>

Defendant has already received a huge benefit by avoiding a conviction under 18 U.S.C. § 924(c), and the 60-month mandatory consecutive term that would have come with it. When considering the context of this case, Defendant's crimes are more serious than a simple D-level

---

[13] A juvenile female was not present when the search warrant was executed. However, Defendant asserts that he is a single father raising his (now) 14-year-old daughter and that she depends on Defendant for care, shelter, food and guidance. Doc. 51, page 11.

8

marijuana possession with intent to distribute. Defendant was making significant amounts of money on his illegal drug trafficking, and using his quasi-legitimate business as a front for the real moneymaking. He also used his store and home to store other drugs and ten firearms, half of which were stolen. Defendant has no respect for the law, criminal or otherwise. Affording him leniency that he has not earned does not promote respect for the law. Thus, in balancing all of the factors, the United States is in support of a 57-month sentence. The offense here is serious, and a sentence of 57 months would reflect that. It will also promote respect for the law, provide just punishment for these offenses, provide adequate deterrence, and protect the public from further crimes of Defendant, including assisting other criminal behavior.

    IV.    The Sentencing Guidelines for the Applicable Category of Offense Committed by the Applicable Category of Defendant

One of the Section 3553(a) factors that the Court must consider is the sentencing range established by the United States Sentencing Commission for the applicable category of offense committed by the applicable category of defendant. The Supreme Court has recognized that even in the post-*Booker* world "the [Sentencing] Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise . . . .'" *Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007). "In the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve 3553(a)'s objectives.'" *Id.* The Court must consider the advisory guideline range in determining the defendant's sentence.

Defendant's guideline range is 46-57 months. As stated in the PSR, the average length of imprisonment imposed for Defendant's with the same charge of conviction, final offense level,

and criminal history category was 41 months, and the median length of imprisonment imposed was 46 months.[14] Defendant would like to receive a sentence of credit time served (19 days in federal custody), a sentence that is more than 45 months below the low end of the guideline range in this case. The only grounds Defendant relies on for this request is his family history and that the charge of conviction is a marijuana offense. These do not outweigh all of the specific history and circumstances of this case as discussed above. As such, Defendant's request is unreasonable.

The 57-month sentence the United States is requesting, however, is within the sentencing guideline range. Although at the high end of the guideline range, 57 months is warranted and reasonable based on the plethora of circumstances unique to Defendant's case and history.

## CONCLUSION

After careful consideration of the factors enumerated in Section 3553(a), a sentence of 57 months would be sufficient but not greater than necessary. A 57-month sentence balances *all* of Defendant's criminal history and involvement, as outlined above. The United States respectfully requests a sentence to a term of imprisonment of 57 months, a $10,000 fine, and $1,000 in community restitution.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

    /s/  Nora Wilson
NORA WILSON
Assistant United States Attorney
Post Office Box 607
Albuquerque, New Mexico  87102
(505) 346-7274

---

[14] PSR, ¶ 91.

I HEREBY CERTIFY that I electronically filed
the foregoing with the Clerk of the Court
using the CM/ECF system which will send
notification to defense counsel and probation.

  *Filed Electronically*
NORA WILSON
Assistant United States Attorney